IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00399-MEH

ANDREW JAMES KLEIMAN,

      Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Plaintiff, Andrew James Kleiman, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying his application for disability and disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and his application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c. Jurisdiction is proper under 42 U.S.C. § 405(g). Oral argument would not materially assist the Court in its determination of this appeal. After consideration of the parties' briefs and the administrative record, the Court **reverses and remands** the Commissioner's final order.

## BACKGROUND

### I.    Procedural History

      Plaintiff seeks judicial review of the Commissioner's decision denying his applications for

DIB and SSI filed in December 2011 and April 2012, respectively. [Administrative Record ("AR")

176, 180] After the application was initially denied on June 12, 2012, an Administrative Law Judge

("ALJ") scheduled a hearing upon Plaintiff's request for June 19, 2013. [AR 118] Plaintiff and an

impartial vocational expert testified at the hearing. [AR 55] The ALJ issued a written ruling on July

12, 2013, denying Plaintiff's Title II and Title XVI claims. The ALJ then received additional

evidence from a mental health examination of Plaintiff. [AR 17, 21] On August 2, 2013, the ALJ

issued an amended written ruling, finding the additional medical records did not change the previous

decision. [AR 17] The ALJ found Plaintiff was not disabled since December 10, 2011, because

Plaintiff: did not have a severe impairment equaling those listed in the applicable federal regulations;

had the residual functional capacity ("RFC") to perform light work as he could lift and carry 20

pounds occasionally and 10 pounds frequently; could sit for eight hours in an eight-hour day, stand

for up to 30 minutes, and walk for 15 to 30 minutes per episode for a total of three to four hours;

bend and crouch occasionally; and climb stairs very little. [AR 25-30] The ALJ reasoned that

because Plaintiff could perform "light work" similar to his former position as a ticket taker and

because such jobs exist in the national economy, Plaintiff could perform past relevant work. [AR

30] The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of

the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial

review. [AR 1-4] *See* 20 C.F.R. § 416.1481. Plaintiff timely filed his Complaint with this Court

seeking review of the Commissioner's final decision. Complaint, docket #1.

## II. Plaintiff's Alleged Conditions

Plaintiff was born on February 21, 1981; he was 30 years old when he filed his application

for disability on December 20, 2011, and 31 years old when he filed his application for SSI benefits on April 6, 2012. [AR 176-186] Plaintiff asserted his disability began on December 10, 2011, when he was 30 years old. [*Id.*] He indicated he was unable to work because of his disability caused by cardiovascular problems. [AR 216] Plaintiff claimed that he had problems lifting, squatting, walking, climbing stairs, and concentrating; he also needed to lay down frequently because of fatigue. [AR 229, 63-64]

At Plaintiff's hearing before the ALJ, Plaintiff testified he was working as a part-time receptionist (19 hours per week) at a gym. [AR 16] He was also planning on going back to community college part-time to participate in a woodworking program. [AR 62] Previously, he had worked part-time as a cashier and stocking clerk at a liquor store [AR 61, 77], as a ticket taker for the Denver Center for the Performing Arts ("DCPA") for five years, and as a clerk at a record store. [AR 73-74] The ALJ found Plaintiff was capable of performing past relevant work as a ticket taker. [AR 30]

## III.   Medical Evidence

### A.   Physical Health

The medical evidence shows Plaintiff first sought treatment on November 18, 2011, at Denver Health Medical Center ("Denver Health") Urgent Care for reported exhaustion, diarrhea, leg swelling, and chronic shortness of breath. [AR 473, 476, 479] His healthcare providers could not identify a cause for his symptoms. [AR 477] Later that month, on November 23, 2011, Plaintiff returned to Denver Health with a jaundiced appearance, complaining of fatigue. [AR 471, 473] His liver function tests were abnormal, which the provider attributed to alcohol abuse. [AR 471]

3

Plaintiff was told he did not have hepatitis, but he was advised to eliminate caffeine and alcohol from his diet and to get regular sleep. [*Id.*]

Plaintiff returned to Denver Health on December 15, 2011, complaining of shortness of breath, chest pain, nausea, itching, jaundiced appearance, and swelling in his legs. [AR 381, 368, 390-91, 433, 441] He admitted to past alcohol abuse, but said he had not used alcohol in a month. [AR 391,386] He was hospitalized for the last half of December 2011. [AR 377-78] When he was discharged on December 30, 2011, the attending physician diagnosed him with nonischemic dilated cardiomyopathy, deep vein thrombosis, congestive hepatopathy, anemia, thrombocytopenia, severe tricuspid regurgitation, and anxiety. [*Id.*] Plaintiff had experienced no prior medical history, but the physician noted he had three months of progressive fatigue, dyspnea on exertion, and edema. [*Id.*] They also noted he had what appeared to be a partially collapsed lung. [AR 467] The physician prescribed drug treatment to attempt to improve his heart failure, but they noted there was little they could do for the tricuspid regurgitation except wait. [AR 378] The cause of his condition remained unexplained. [AR 377]

On January 18, 2012, Plaintiff returned to the cardiology clinic for a follow-up; an x-ray revealed his heart had improved but still had mild edema. [AR 351] The attending physician assessed Plaintiff with dilated cardiomyopathy, congestive heart failure, severe tricuspid regurgitation, pulmonary edema, and deep vein thrombosis. [AR 342] Two weeks later, on February 2, 2012, Plaintiff's systolic blood pressure was in the 60s, and he reported fatigue. [AR 267] The examiner reported he appeared lethargic and thought Plaintiff "may need [a heart] transplant evaluation." [AR 268] He was sent to the Emergency Department and hospitalized at

4

Denver Health for five days.  [AR 265, 268, 297]  While there, he underwent a procedure that revealed normal functioning of the arteries but elevated pressure in his heart. [AR 274, 276]  When he was discharged on February 7, 2012, he was diagnosed with acute decompensated systolic congestive heart failure, nonischemic dilated cardiomyopathy of undetermined etiology, history of deep vein thrombosis and pulmonary edema, and hyperbilirubinimia.  [AR 274]

On April 5, 2012, at an outpatient visit to Denver Health, Plaintiff stated his health had improved, he could walk around all day, and he had recently "played catch [and] sprinted in city park." [AR 494]  Nevertheless, the ejection fraction of his heart was noted to be 10-20 percent, whereas a normal ejection fraction for a male his age should be 60 percent.  [AR 590, 606]  Later that month, on April 30, 2012, at a follow-up appointment for deep vein thrombosis, the doctor noted Plaintiff had increased energy since the last clinic visit, no shortness of breath, no chest pains, and that the edema was resolved.  [*Id.*]  His vital signs were stable with blood pressure at 93/55, and he "look[ed]  significantly better" since the previous visit.  [*Id.*]

On June 19, 2012, Plaintiff had another follow-up appointment for deep vein thrombosis wherein his physician noted his heart had "improved somewhat" but still had an ejection fraction of 25-30 percent.  [AR 564]  The echocardiogram indicated he would likely have "an ICD [implantable cardioverter-defibrillator] placed in the near future." [*Id.*]  The doctor ordered a liver biopsy, thinking it would be useful in the future to help inform the doctors on the necessity of a future heart transplant.  [*Id.*]  The following month, on July 5, 2012, Plaintiff stated he was "trying to exercise daily" by walking and that he "fe[lt] well." [AR 561]

By October 25, 2012, Plaintiff reported no negative symptoms and was doing all of his

activities of daily living ("ADLs") including going to school at Red Rocks community college part-time.  [AR 535]  By February 2013, Plaintiff could climb two to three flights of stairs, walk two-to-three miles a day, and "sometimes work out for 30 minutes."  [AR 599]  He was also doing vocational rehabilitation to pursue a career in woodwoorking, but complained he could not "think well."  [*Id.*]  However, three months later, in January of 2013, Plaintiff called his doctor, stating he was willing to try warfarin "in hope[s] that his vertigo dilemma" would not return.  [AR 605]  He also said he was not tolerating Coumadin therapy well; he felt lethargic and dizzy.  [*Id.*]

### B.  Mental Health

When Plaintiff was first hospitalized in December 2011, his memory was good, he was fully oriented, and he could follow simple commands.  [AR 477]  He was also taking anti-anxiety medication.  [AR 401]  On January 18,  2012, Plaintiff was noted to be taking Celexa and had anxiety, depression, and confusion with blood pressure titration.  [AR 348]

When he returned to the hospital on February 20, 2012, his mood was much better and his anxiety was down.  [AR 264-65, 523-24]  He complained of symptoms consistent with attention deficit hyperactive disorder ("ADHD").  [*Id.*]  The caregiver, a psychologist, noted Plaintiff had a history of anxiety and depression with obsessive-compulsive disorder traits, and past alcohol abuse, but he not had alcohol for three months.  [*Id.*]  Furthermore, the psychologist ruled out obsessive-compulsive disorder as well as generalized anxiety, but diagnosed him with early remission from alcohol dependance and inattentive ADHD.  [*Id.*]  He also noted Plaintiff had taken Paxil in the past but was currently taking Lexapro, which helped somewhat, but Plaintiff believed he needed something to treat his inattention and impulsivity.  [*Id.*]

6

In March of 2012, a psychologist noted Plaintiff said he was "doing better" and had maintained sobriety for approximately five months.  [AR 501]  He told the psychologist he had recently become engaged to his girlfriend and was optimistic about his relationship and future life and had no other issues or concerns.  [*Id.*]  The doctor recommended a decrease in his Lexapro diagnosis and added Wellbutrin to assist with Plaintiff's attention and concentration issues.  [*Id.*]  One month later, on April 16, 2012, Plaintiff returned to Denver Health's behavioral health outpatient clinic and reported that a recent medication change worked well for his anxiety, he had "the best week [he could] recall in a long time," but he reported increasing concentration and memory issues and "brain fog."  [AR 493]

Several months later, beginning in October 22, 2012, Plaintiff began a course of psychotherapy at the University of Denver Graduate School of Psychology clinic with a student therapist under the supervision of a licensed psychologist.  [AR 619, 623-644]  These weekly sessions lasted through May of 2013.  Plaintiff was diagnosed with major depressive disorder, recurrent, moderate.  [AR 621]  The student therapist assigned Plaintiff a global assessment of functioning score ("GAF")[1] of 70.  [*Id.*]

---

[1]In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows: The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning.  *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000).  GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities.  No symptoms."
• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally

7

## IV.    Physical Medical Source Opinions

### A.    Treating Physicians

#### 1.    Lucy Esberg, M.D.

Dr. Esberg, a cardiologist at Denver Health, submitted a letter on Plaintiff's behalf on March

14, 2013, stating that "[o]verall, [Plaintiff] has improved greatly, however, he may not reach normal

---

satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."

• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."

• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."

• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."

• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."

• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."

• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."

• 0: "Inadequate information."

physiology and functional class." [AR 606] She also stated that Plaintiff "carries a diagnosis of non-ischemic dilated cardiomyopathy with an estimated ejection fraction of 30 [percent]," and that his New York Heart Association is class II, meaning "he gets shortness of breath with exertion." [*Id.*] In May of 2013 she conducted a Cardiac Medical Source Statement in which she noted that doctors diagnosed Plaintiff with a lifelong prognosis of "idiopathic dilated non-ischemic cardiomyopathy with heart failure." [AR 607] The clinical findings and lab reports showed the patient had "persistently poor ejection fraction on echocardiogram with persistent functional limitations." [*Id.*] She concluded that Plaintiff could walk five to six blocks without resting, stand less than two hours per day, lift ten pounds frequently, would be off-task 20 percent of the time, was limited in his ability to crouch/squat, climb stairs and ladders, and would need to take unscheduled breaks every three hours for approximately 15 minutes. [AR 608-610] Additionally, her notes indicate Plaintiff suffers from depression and anxiety which is "exacerbated by him being a young man with such a severe heart condition." [AR 610]

2.   David Ginosar, M.D.

On July 1, 2013, Dr. Ginosar, a cardiologist at Denver Health who had provided care for Plaintiff since January 2012, submitted a letter on Plaintiff's behalf. [AR 618] As Plaintiff's treating physician, he concluded that Plaintiff's "ability to work is significantly reduced by his cumulative fatigue while working," resulting in great difficulty working more than four hours daily. [*Id.*] He came to this conclusion because Plaintiff carries "a rare, serious and debilitating diagnosis of non-ischemic cardiomyopathy in a young man," meaning his heart works improperly and that he becomes "somewhat short of breath with mild exertion." [*Id.*] Furthermore, the doctor asserted that

Plaintiff becomes physically ill after "moderate to severe exertion," requiring a two-to-three day recovery.  [*Id.*]

    B.    Consultative Examining Physicians

        1.    <u>Richard Carson, M.D.</u>

Dr.  Carson, a consultative examiner, performed an examination on May 18, 2012, at the request of Disability Determination Services ("DDS").  [AR 532-534]  Plaintiff's exam was unremarkable except for a mild heart murmur.  [AR 533]  The doctor opined that Plaintiff could sit for eight hours, stand for up to half an hour, walk for 15 to 30 minutes, lift or carry 20 pounds or so occasionally, bend and crouch occasionally, and climb stairs very little.  [AR 534]  He noted that Plaintiff had no impairments with pushing or pulling against light resistence, nor impairments reaching, handling, or grasping.  [*Id.*]

## V.    Mental Health Source Opinions

    A.    Treating Mental Health Providers

        1.    <u>Carrie Landin, Psy.D.</u>

Dr. Landin, a psychologist, evaluated Plaintiff during three sessions from September 24, 2012, to October 8, 2012.  [AR 619]  She diagnosed Plaintiff with recurrent, moderate major depressive disorder and noted he was "currently in stable condition."  [AR 621]  She also indicated that though Plaintiff was "currently experiencing psychological distress" he was also "generally functioning well," and therefore assigned him a GAF score of 70.  [*Id.*]

        2.    <u>Erica Lipner-Bernstein</u>

Ms. Lipner-Bernstein, a student psychologist at the University of Denver Graduate School

of Professional Psychology under the supervision of Dr. Landin, saw Plaintiff once a week for 10 months from September 24, 2012, to June 18, 2013, and completed a Mental Impairment Questionnaire on June 25, 2013. [AR 611, 617] Ms. Lipner-Bernstein diagnosed Plaintiff with recurring, moderate major depressive disorder, and assigned him a GAF score of 66. [AR 611] She indicated Plaintiff experienced decreased energy, suicide ideation, feelings of guilt or worthlessness, generalized anxiety, mood disturbance, recurrent and intrusive recollections of a traumatic experience, persistent disturbances of mood or affect, emotional withdrawal or isolation, easy distractibility, memory impairment, and sleep disturbance. [AR 612] She believed Plaintiff's impairments would cause him to be absent from work "about four days a month" and that this should be expected to last at least 12 months. [AR 616]

B.     Consultative and Reviewing Mental Health Examiners

1.     William V. Lewis, Ph.D.

Dr. Lewis, a psychologist, performed a consultative psychiatric evaluation on Plaintiff at the request of DDS On May 20, 2012. [AR 526-31] He diagnosed Plaintiff with ADHD and depressive disorder, and assigned him a GAF score of 40. [AR 530] The doctor believed Plaintiff would "have moderate difficulties being able to understand, remember and carry[] out short, simple instructions" as well as "moderate to marked difficulties" in understanding, remembering, and carrying out more complex instructions. [*Id.*] Plaintiff's physical limitations would, in Dr. Lewis's opinion, cause Plaintiff to "struggle with prolonged interactions throughout a typical day." [*Id.*] The doctor suggested "therapy and medication evaluation from a mental health clinic" to help Plaintiff cope with his depressive symptoms. [*Id.*]

11

2.      James J. Wanstrath, Ph.D.

Dr. Wanstrath, a state agency psychologist, reviewed the record on June 7, 2012, and concluded Plaintiff had mild to moderate mental functional limitations. [AR 87-88] He believed Plaintiff would have no problems performing simple work tasks. [AR 92]

3.      David Benson, Ph.D.

Dr. Benson, a psychologist, evaluated Plaintiff at the request of Plaintiff's rehabilitation services counselor on December 8, 2012, and found it "is hard for him to sustain steady energy[,] and he gets fatigued and is susceptible to acquiring viruses such as colds." [AR 592] Dr. Benson diagnosed Plaintiff with adjustment disorder and ADHD, and concluded Plaintiff had serious vocational limitations such as frequently making "rash or unwise decisions" that negatively affect his work settings. [AR 595] Additionally, Dr. Benson found Plaintiff significantly distorted or refused to "accept his vocational capacities with respect to limitations imposed by the disability," and has memory and concentration deficits that "interfere significantly with remembering job instructions and/or performing job tasks." [AR 596] He concluded Plaintiff "has marked medical limitations[,] and it will be hard to do what is necessary to find his way to a consistently productive role in the work world as a result." [AR 596]

VI.    **Hearing Testimony**

The ALJ held an administrative hearing on June 19, 2013, at which Plaintiff was represented by counsel. [AR 55-80] Plaintiff's attorney opened his remarks by reminding the ALJ that Plaintiff continues to have ejection fractions of 30 percent or below. [AR 58] The ALJ was under the impression it had increased to 60 percent from 15 percent, but Plaintiff corrected him, stating the

ejection fraction had been between 25 and 30 percent for his last two echocardiograms and had

never reached 60 percent. [AR 58-59] Plaintiff's attorney then explained Plaintiff had not received

an exercise test yet because his physician told him he was too weak to have one. [AR 59] He also

indicated Plaintiff's student counselor at the University of Denver, Ms. Lipnor-Bernstein, had not

yet sent her notes to Plaintiff's attorney for the record, but he would submit those notes to the ALJ

as soon as he received them. [*Id.*] The attorney then asserted that, because of the combined

impairments, Plaintiff could not work full-time on a competitive basis, because Plaintiff has

problems with exertion and moving around for long periods of time, becomes short of breath easily,

and needs to lie down periodically due to his heart problems. [AR 60]

Plaintiff testified that for the past month, before the hearing, he had been working 19 hours

a week at a gym performing tasks similar to those of a receptionist, such as checking people in,

selling guest passes, and answering telephones. [AR 61] He explained he was working only 19

hours a week because that was the schedule his employer dictated to him. [AR 62] Plaintiff testified

he planned on going back to school in the Fall semester in the woodworking department at Red

Rocks community college; however, in the past, he had tried to work part-time and go to school part-

time and suffered in both by missing classes and work. [*Id.*] He hoped to "work one or two short

shifts in the week and then go to school two days a week, if possible," but conceded he would need

to see how it "works out for the first month," and said he might need to cut back. [AR 62-63] When

he previously worked part-time and studied part-time, he would become fatigued and "really

winded" if he focused on work or school for five or six hours, especially if he "did multiple days or

consecutive days." [AR 63, 65-66] If he worked a full day, then the next day he would "absolutely"

need to rest, stating that even working a job at which he would not be on his feet all day was not possible for him.  [AR 66]  When he felt fatigued, he would often need to lie down and rest, sometimes napping for a couple hours at a time. [AR 63-64]  Additionally, the fatigue would cause him to lose focus and, if he was operating power tools, require him to stop for safety's sake.  [*Id.*]  If he pushed himself too hard, he said he would get sick.  [*Id.*]  Whenever he became sick the previous semester he "only . . . miss[ed] about three or four classes," but he would miss two or three days of work. [AR 67-68]  Furthermore, the recovery would take two weeks.  [AR 68]  He stated that if he had adequate rest, he would not have trouble following simple instructions.  [AR 69]  However, several days a week, when not rested, he would have trouble making basic decisions such as remembering driving directions, doing every day tasks, or handling simple work duties.  [*Id.*]

When asked about his studies, Plaintiff replied that his teachers accommodated the needs associated with his heart condition by letting him leave early, work outside the normal class time, and make up lost time.  [AR 70]  Most of his studies were "hands on," such as building tables.  [AR 70-71]  He stated his end goal was to operate a workshop at home and work on projects as long as he felt well, as he desired to create a "substantial income" that worked with his health problems. [AR 71]

Plaintiff said he quit his job at the DCPA after approximately five years because he had "been there long enough" and did not like some of the changes the management made, stating it was not a pleasant place to work anymore.  [AR 71-72] Plaintiff's record indicates he worked at DCPA from December 2006 to November 2010, quitting one year before the onset of his claimed disability. [AR 232]  He said anxiety and depression played a role in the decision to leave, describing the

anxiety as generalized and "exacerbated by the depression." [AR 71-72] He explained that the anxiety and depression were the primary difficulties in his life until his heart disease started. [*Id.*] When asked to provide an example of the anxiety, he said he would do "a lot of obsessive thinking" to the point where it became difficult for him to leave his house because he felt "overwhelmed, afraid, confused." [AR 73] This anxiety, he said, had cost him jobs and relationships over the years. [*Id.*] For example, Plaintiff said he quit his job at a record store because, due to his anxiety, he could not leave his house, resulting in him missing work two or three days a week. [*Id.*] When the ALJ asked him about his current state of mind, Plaintiff said he was not on any medications at the moment and was able to get out the door every day. [AR 74] He described the depression as "textbook," meaning "no motivation, no joy ... not being able to ... muster any energy to do basic stuff," but, he said he had good days and bad days. [AR 75] Once a week he would have a "bad day" where he got nothing done because of the depression. [AR 75-76] As for his physical health, he said his anxiety and depression is "compounded by the heart failure," especially considering his age. [AR 76]

The ALJ concluded the hearing by briefly examining Robert Schmidt, a vocational expert ("VE"). [AR 79] The ALJ asked him to characterize Plaintiff's job at the DCPA, to which the VE responded by identifying such a job as "Skill Level SVP of 2 and a light exertional level." [AR 79]

The ALJ issued an unfavorable decision on July 12, 2013, followed by an amended unfavorable decision on August 2, 2013.

## **LEGAL STANDARDS**

**I.      SSA's Five-Step Process for Determining Disability**

To qualify for benefits under sections 216(i) and 223 of the Social Security Act, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB and/or SSI for a period of disability, and be "disabled" as defined by the SSA. 42 U.S.C. §§ 416(i), 423, 1382. Additionally, SSI requires that an individual meet income, resource, and other relevant requirements. *See* 42 U.S.C. § 1382.

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity. If he is, disability benefits are denied. *See* 20 C.F.R. §§ 404.1520, 416.920. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is unable to show that his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. *See* 20 C.F.R. 404.1520(c). Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment is not listed, he is not presumed to be conclusively disabled. Step

16

Four then requires the claimant to show that his impairment(s) and assessed residual functional capacity ("RFC") prevent him from performing work that he has performed in the past. If the claimant is able to perform his previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## II.    Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health*

*& Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).  However, reversal may be appropriate when

the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal

standards.  *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## ALJ's RULING

The ALJ found that Plaintiff met the insured requirements of the Social Security Act through

December 31, 2015, and had not engaged in any substantial gainful activity since December 10,

2011, the alleged onset date (Step One).  [AR 20] He then found that Plaintiff suffered only from

one severe impairment, non-ischemic dilated cardiomyopathy, but that the liver and pulmonary

problems had been treated and did not meet the 12-month durational requirement (Step Two).  [*Id.*]

Based on a review of the entire record, the ALJ found that Plaintiff's impairments do not meet or

equal the severity of one of the listed impairments deemed to be so severe as to preclude substantial

gainful employment (Step Three).  [AR 25]  He also found Plaintiff had the RFC to perform past

relevant work as a ticket taker, which involves light exertion as quantified by the Dictionary of

Occupational Titles (DOT) number 344.667-010.  [AR 30]  The ALJ noted that "Plaintiff's ability

to attend class, maintain a relationship with his girlfriend, and work in a job that requires significant

interaction with the public clearly shows that he does not have severe limitations in social

functioning."  [*Id.*]

The ALJ stated the medical evidence revealed that Plaintiff's various ailments (liver disease,

pulmonary disorder, depression, ADHD, and chronic anxiety), except for the non-ischemic dilated

cardiomyopathy, did not reach the severe level "because they do not significantly limit [Plaintiff's]

physical or mental ability to do basic work."  [AR 21]  The ALJ pointed out that Plaintiff's treatment

notes from his hospitalization showed an enlarged liver and partially collapsed lung, both of which responded well to treatment and, after March 2012, were no longer part of his medical treatment. [*Id.*]  Because the symptoms relating to Plaintiff's pulmonary and liver disorders were brief in duration, the ALJ ruled they were "non-severe [and] did not satisfy the 12-month durational requirement."  [*Id.*]  The ALJ found Plaintiff's non-ischemic dilated cardiomyopathy was a severe impairment beginning in late 2011, but nevertheless determined that Plaintiff "would be able to perform either activity on a full-time basis" for two reasons: (1) Plaintiff's condition and functional abilities continued to improve; and (2) Plaintiff was "attending community college on a part-time basis and [wa]s working part-time."  [AR 28]  These two factors combined "further erod[ed] [Plaintiff's] . . . assertions that his physical impairments preclude him from working."  [*Id.*]

Regarding the mental health evidence, the ALJ determined that Plaintiff had medically determinable mental health impairments, but they were not "severe."  [AR 21]  The ALJ came to this conclusion because Plaintiff reported decreased anxiety and improved concentration when he briefly took psychotherapeutic medication.  [*Id.*]

When Plaintiff's attorney submitted new mental health records to the Hearing Office, the ALJ reviewed those records and issued an amended decision reaffirming his ruling, finding the additional records did "not detail severe mental impairments," because (1) the person issuing the documents was a student therapist; (2) she was not a medically accepted medical source; and (3) while Plaintiff was diagnosed with major depressive disorder, he was also assessed a GAF score of 70, indicating mild to very mild limitations.  [AR 21-22]  The student therapist's records indicated that in February 2013, Plaintiff told the student therapist he had decided to no longer "turn down

19

opportunities solely to make him a better disability candidate." [AR 22] The ALJ took this to suggest that "some of the [plaintiff's] reduced activities were not related to his impairments and were instead motivated by a desire to bolster his disability claim."  [AR 22]

He also ruled that Plaintiff's reported activities are not consistent with severe mental impairments.  [AR 22]  Because the Plaintiff had been studying woodworking and design since 2012, was working 19 hours a week, and had previously worked at a liquor store part-time while also attending classes, the ALJ concluded that the plaintiff "retain[ed] the concentration, focus, and attention necessary to engage in some forms of employment."  [*Id.*]  He also found that the plaintiff's ability to attend class and work required "significant social interaction," which is "inconsistent with severe limitations in social functioning."  [*Id.*]

The ALJ also reviewed the opinion evidence regarding Plaintiff's physical health and afforded minimal weight to both treating physicians and the consultative examiner.  Dr. Esberg was Plaintiff's cardiologist at Denver Health for the year preceding the hearing.  [AR 606]  In response to her opinion that Plaintiff would miss four days of work per month and be off-task 20 percent of the time, the ALJ reasoned that, if this were true, Plaintiff "would not be able to keep his employment or complete his class work."  [AR 29]  He found those limitations inconsistent with Plaintiff's reported activities and therefore afforded minimal weight to her opinion.  The ALJ also afforded minimum weight to Dr. Ginosar, Plaintiff's treating physician and cardiologist, because he believed the doctor's opinion was "inconsistent with [Plaintiff's] ability to study woodworking in school and maintain part-time employment while still performing significant activities of daily living."  [AR 29-30]  He further reasoned that Dr. Ginosar's opinion should carry minimal weight

because Plaintiff's reported activities "show he is capable of performing more than part-time work," contradicting Dr. Ginosar's opinion that Plaintiff could only work four hours a day.  [AR 30]  Lastly, the ALJ afforded minimal weight to Dr. Carson's (the consultative examiner) opinion that Plaintiff could sit for eight hours during a normal workday and stand for 30 minutes while walking for 15 to 30 minutes per episode, because the examiner's examination did not "reflect the full extent of the claimant's recovery."  [AR 29]  Furthermore, the ALJ afforded minimal weight to the examiner's opinion, because Plaintiff's ADLs and endeavors at school and work showed he had greater functional abilities than those the examiner described.  [*Id.*]

The ALJ also discussed the opinion evidence in regard to Plaintiff's mental impairments. He found that the opinions were not consistent with Plaintiff's ADLs, reported social interactions, ability to attend school, or lack of medical treatment.  [AR 23]  The ALJ  cited a consultative examination by Dr. Lewis, Ph.D, in May 2012 where Plaintiff "demonstrated good abstract thinking, interpretation of proverbs, judgment, and reasoning," results which were not consistent with "severe limitations in concentration, persistence, or pace." [*Id.*] Nevertheless, the same examiner assigned Plaintiff a GAF score of 40 and thought Plaintiff would have moderate problems carrying out complex instructions and would experience limitations in social functioning.  [*Id.*]  The ALJ afforded minimal weight to this opinion, because he found it was not supported by objective medical evidence and was inconsistent with Plaintiff's ability to attend work and class simultaneously.  [*Id.*] The ALJ also afforded minimal weight to the SSA's examination of Plaintiff by Dr. David Benson, Ph.D, who opined that it would be hard for Plaintiff to be consistently productive in the working world.  [AR 24]  He afforded minimal weight to this opinion because it was unclear if the examiner

was referring to the "medical or psychological limitations" of Plaintiff, and because the examiner's opinion contradicted Plaintiff's ability to attend both school and work part-time. [AR 24] Finally, the ALJ also afforded minimal weight to the opinion evidence of Dr. Landin, a supervising psychologist, and Ms. Lipner-Bernstein, a student therapist at the University of Denver, who together opined that Plaintiff had moderate limitations in social functioning and ADLs, and marked limitations in concentration, persistence, and pace. [*Id.*] The ALJ minimized the weight of their opinion because it was inconsistent with Plaintiff's ability to both attend class part-time and work a part-time job requiring significant customer service and social interaction without the need for psychotherapeutic medication. [*Id.*]

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the ALJ erred by (1) failing in his duty to develop the record regarding whether Plaintiff's impairments meet or equal the severity of a listing impairment; (2) not relying on substantial evidence and misapplying the law in determining the Plaintiff does not have severe mental impairments; and (3) failing to apply the treating physician rule. Opening Brief, docket # 18 at 1, 19, 23, 25.

## ANALYSIS

### I.     Duty to Develop the Record

Plaintiff argues the ALJ had a duty – both under case law and the Code of Federal Regulations ("C.F.R.") – to develop the record by purchasing an exercise tolerance test ("ETT") to determine whether Plaintiff met the Listing of Impairment for Chronic Heart Failure. Opening Brief, docket # 18 at 22. Defendant responds it is not the ALJ's duty to order the ETT; such a decision is

discretionary, and requiring otherwise would inappropriately place the burden of proof on the ALJ instead of on Plaintiff.  Response, docket #19 at 14, 15.

The ALJ is not a plaintiff's advocate, but the ALJ has a duty to inquire and develop the record to ensure that he is aware of "facts relevant to his decisions" and to learn the plaintiff's version of the facts." *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993) (citing *Heckler v. Campbell*, 461 U.S. 458, 471 n.1 (1983) (Brennan, J. Concurring)). Reversal is not required when the ALJ's discussion of the evidence in Step Three of the five-step process is "insufficiently detailed" because, at other steps of the process, he may provide a proper basis for concluding that a plaintiff's impairments do not meet or equal a listing.  *Fisher-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005).  The C.F.R. provides scenarios where the ALJ will and will not consider whether an ETT is needed to make a determination.  *See* C.F.R. Part 404, subpart P, app. 1, listing 4.00C6.[2]  Additionally, if medical sources cannot give sufficient medical evidence regarding a plaintiff's impairments, the ALJ "may ask [a plaintiff] to have one or more physical or mental examinations."  20 C.F.R. §§ 404.1517, 416.917.  If the ALJ cannot get the

---

[2]C.F.R. Part 404, subpart P, app. 1, listing 4.00C6 reads:
> "a. We will consider whether to purchase an exercise test when:
>
> (i) There is a question whether your cardiovascular impairment meets or medically equals the severity of one of the listings, or there is no timely test in the evidence we have (see 4.00C9), and we cannot find you disabled on some other basis; or
>
> (ii) We need to assess your residual functional capacity and there is insufficient evidence in the record to make a determination or decision.
>
> b. We will not purchase an exercise test when we can make our determination or decision based on the evidence we already have."

information he needs from a plaintiff's medical sources, he "may decide to purchase a consultative examination." 20 C.F.R § 404.1519a. Such situations would be when "the additional evidence needed is not contained in the records of [a plaintiff's] medical records." 20 C.F.R. § 404.1519(b)(1).

C.F.R. Part 404, subpart P, app. 1 contains the requirements for the listing in question: 4.02, *Chronic Heart Failure*. Those requirements are:

> The required level of severity for this impairment is met when the requirements in *both A and B* are satisfied.
>
> A. Medically documented presence of one of the following:
>
> 1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or
>
> 2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);
>
> AND
>
> B. Resulting in one of the following:
>
> 1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or
>
> 2. Three or more separate episodes of acute congestive heart failure within a consecutive 12-month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

> 3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:
>> a. Dyspnea, fatigue, palpitations, or chest discomfort; or
>> b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or
>> c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or
>> d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

Here, Plaintiff concedes he did not meet the requirements for Listing 4.02 because, while his medical records show (and the ALJ agrees [AR 25]) that he meets part A of the requirement, he did not have evidence that would satisfy part B. Opening Brief, docket #18 at 21. Plaintiff could not produce evidence that would satisfy sections 1 or 2 of part B; however, had an ETT been made available, the ALJ would have been able to determine if Plaintiff equaled or exceeded the listing. Plaintiff did not provide an ETT as evidence because "his doctor told him he was too weak to have one." [AR 59] The ALJ's decision discusses the fact that Plaintiff's heart condition is a severe impairment but that the impairment does not meet or equal a listing. [*Id.*] The ALJ noted that he "considered all relevant listings, including ... listing 4.00 *Cardiovascular System, et al.* (which includes 4.02, *Chronic Heart Failure*). [AR 25] However, his decision neither addresses why the ALJ did not order an ETT nor the fact that Plaintiff was potentially too weak to perform one. The Court finds this a compelling factor worthy of the ALJ's analysis.

The Court recognizes that the ALJ "will not purchase an exercise test when [the ALJ] can make [its] determination or decision based on the evidence [it] already ha[s]," which it may have done here. C.F.R. Part 404, subpart P, app. 1, listing 4.00C6b. Nevertheless, the ALJ does have a duty to develop the record and a duty to ensure he has all the relevant facts. *Henrie*, 13 F.3d at 361. The Court is not required to reverse when the ALJ's decision provides "insufficient detail."

*Fisher-Ross*, at 733.  Yet, it must be clear that the ALJ considered all the relevant evidence.  *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 2007).  On this record, the Court finds the ALJ's opinion void of important analysis regarding Plaintiff's ability to participate in an ETT, thus the Court must remand and instructs the ALJ to either further develop the record or elaborate on its decision to not address the potential need for an ETT.

## II.    Treating Physician Rule

Plaintiff argues the ALJ erred when he found Plaintiff was not disabled because the ALJ afforded minimal weight to both treating physicians' medical opinions and the consultative examiner's opinion, and instead relied on his own speculations regarding the Plaintiff's abilities. Opening Brief, docket #18 at 26-28.  Defendant responds that the ALJ's finding was fully supported by the non-medical evidence and that the ALJ alone has the duty to determine Plaintiff's RFC. Response, docket #19 at 17.

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional."  *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (citing 20 C.F.R. § 401.1527(d)).  The ALJ must "give consideration to all the medical opinions in the record" and "discuss the weight he assigns to them."  *Mays v. Colvin*, 739 F.3d 569, 578 (10th Cir. 2014) (internal quotation marks omitted).  The applicable regulations governing the SSA's consideration of medical opinions distinguish among "treating" physicians, "examining" physicians and "nonexamining" (or "consulting") physicians.  *See* 20 C.F.R. § 416.927(c).

When assessing how much weight to give a treating source opinion, the ALJ must complete a two-step inquiry, each step of which is analytically distinct.  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).  The ALJ must first determine whether the opinion is conclusive – that is, whether it is to be accorded "controlling weight" on the matter to which it relates.  *Watkins v.*

*Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d at 1330.  If the opinion is not supported by medically acceptable evidence, then the inquiry at this stage is complete. *Watkins*, 350 F.3d at 1300. However, if the ALJ "finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record." *Id*.  If not, the opinion is not entitled to controlling weight. *Id*.  In contrast, if the medical opinion of a treating physician is well supported by medically acceptable evidence and is not inconsistent with the other substantial evidence in the record, an ALJ must give it controlling weight.  *Sedlak v. Colvin*, No. 11-cv-01247-PAB, 2014 WL 717914, at *10 (D. Colo. Feb. 24, 2014) (citing 20 C.F.R. § 416.927(c)(2)).

If the opinion of a treating physician does not merit controlling weight or if there is no opinion by a treating physician, the ALJ must move to Step Two and consider the following factors in determining how to evaluate other medical opinions in the record: length of the treating relationship, frequency of examination, nature and extent of the treating relationship, evidentiary support, consistency with the record, medical specialization, and other relevant considerations. *Id.* "An ALJ may dismiss or discount an opinion from a medical source only if his decision to do so is 'based on an evaluation of all of the factors set out in the cited regulations' and if he provides 'specific, legitimate reasons' for [the] rejection." *Id.* (quoting *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012)).

It is error for an ALJ not to adequately state and explain what weight he or she gives to medical opinions. *See Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).  The ALJ must give "good reasons" for the weight he or she ultimately assigns each medical opinion. *Watkins*, 350 F.3d at 1301.  The ALJ's decision must be sufficiently specific to make clear to any subsequent reviewer the weight given to the medical opinion, and the reason for that weight. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).  Even though an ALJ is not required to discuss every

piece of evidence, it must be clear that the ALJ considered all of the evidence. *Clifton*, 79 F.3d at 1009-10. "[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.* at 1010. Boilerplate language, unconnected to any evidence in the record, will not suffice to support an ALJ's conclusion. *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). An ALJ may reasonably give less weight to a medical opinion that differs from that same doctor's notes. *See Newbold v. Colvin*, 718 F.3d 1257, 1266 (10th Cir. 2013).

Here, the ALJ evaluated every medical opinion in the record and discussed the weight he assigned them. [AR 29] He did not discuss whether the opinions were conclusive or not, but did consider the opinions' consistency with the record and the nature and extent of the treating relationships. [AR 29-30] For example, he explained he afforded minimal weight to Drs. Ginosar, Esberg (the treating physicians), and Carson (the consultative examiner) because the limitations they each described were not consistent with Plaintiff's reported activities. [AR 29-30] Dr. Ginosar limited Plaintiff to four hours of work per day, but the ALJ found this inconsistent with Plaintiff's ability to study and work part-time while also performing ADLs, speculating that if Plaintiff focused on either work or school, he could do so full-time. [AR 30] Similarly, Dr. Esberg limited Plaintiff to low stress work, requiring two hours or less of standing or walking per day while also noting that Plaintiff would be off-task 20 percent of the time and would likely miss more than four days of work per month. [*Id.*] The ALJ reasoned that if these limitations were true, Plaintiff would not be able to keep his job or complete his class work, therefore he found the limitations and Plaintiff's reported activities inconsistent and gave the opinion minimal weight. [*Id.*]

The ALJ's reliance on Plaintiff's reported ADLs is misplaced. The ALJ appears to have taken Plaintiff's statement that he would "try to still work one or two short shifts in the week and then go to school two days, if possible" [AR 62-63] to demonstrate that Plaintiff was already

participating in full-time activity — going to school part-time and working part-time. Thus, the ALJ concluded that Plaintiff could work full-time instead as that would "generally require the same level of exertion and energy as a full-time job without additional activities." [AR 30]  The ALJ appears not to notice Plaintiff's immediately preceding statement that Plaintiff had tried to do something similar a year earlier but suffered in both school and work and would instead, this semester, see "how it works out" and perhaps may need to "cut[] back" if his health did not allow him to handle it. [AR 62-63] The Court also makes note of psychologist Dr. Benson's comments that Plaintiff had a difficult time accepting "his vocational capacities with respect to limitations imposed by the disability." [AR 596]

Therefore, it is not "clear that the ALJ considered all of the evidence." *Clifton*, 79 F.3d at 1009-10.  Instead it appears the ALJ has substituted a speculative opinion for the medical opinions of the treating physicians, whose opinions should be accorded "controlling weight" when "well supported by medically acceptable evidence" and "not inconsistent with the other substantial evidence in the record." *Sedlak*, No. 11-cv-01247-PAB, 2014 WL 717914, at *10.  The Court must therefore remand.

## III.   Mental Health Impairments

The Court "address[es] only so much of Plaintiff's arguments as are sufficient to require reversal." *See Cross v. Colvin*, 25 F. Supp. 3d 1345, 2014 WL 969688, at *2 n.1 (D. Colo. 2014). The Court expresses no opinion as to the Plaintiff's remaining arguments and neither party should take the Court's silence as implied approval or disapproval of the arguments. *See Watkins*, 350 F.3d at 1299 ("We will not reach the remaining issues raised by appellant because they may be affected by the [administrative law judge's] treatment of the case on remand.").  The Court also does not suggest a result that should be reached on remand; rather, the Court encourages parties and the ALJ to consider fully and anew the evidence and all issues raised. *See Kepler v. Chater*, 68 F.3d 387,

391-92 (10th Cir. 1995) ("We do not dictate any result [by remanding the case]. Our remand simply assures that the correct legal standards are invoked in reaching a decision based on the facts of the case.") (citations and quotation marks omitted).

## **CONCLUSION**

In sum, the Court concludes the ALJ erred when he (1) neither ordered an ETT nor explained why he did not request one; and (2) misapplied the treating physician rule. The Court thus finds the final decision is not supported by substantial evidence in the record as a whole. Therefore, the decision of the ALJ that Plaintiff Andrew James Kleiman was not disabled is **reversed and remanded** for further review and explanation.

Dated at Denver, Colorado, this 26th day of April, 2016.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge